ORIGINAL

AO106 (Rev. 12/03) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT    unsealed 3·6·08 20

SOUTHERN _____ DISTRICT ~~ORDERED SEALED BY COURT~~

FILED
08 MAR -5 AM 11: 27

CLERK, U.S. DISTRICT COURT

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

3685 Keating Street
San Diego, CA

APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT

Case Number:    '08 MJ 0677

I, Special Agent Brett O'Connor _____ being duly sworn depose and say:

I am a(n) Special Agent for the Drug Enforcement Administration _____ and have reason to believe
                                    Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

See Attachment A.

in the SOUTHERN _____ District of CALIFORNIA _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B.

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

Evidence of a crime and property used in committing a crime; contraband, fruits of a crime, and things criminally possessed;
and propery designed or intended for use or which is or has been used as a means of committing a criminal offense.

concerning a violation of Title 21 / 18 _____ United States code, Section(s) 841(a)(1), 843(b) and 846 / 1956

The facts to support a finding of probable cause are as follows:

See the attached Affidavit of Special Agent Brett O'Connor

Continued on the attached sheet and made a part hereof:    ☑ Yes    ☐ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

March 4 , 2008 _____    at    San Diego, California _____
Date                                                                          City                                    State

Hon. Cathy Ann Bencivengo    U.S. Magistrate Judge    _____
Name of Judge                        Title of Judge                          Signature of Judge

**ATTACHMENT A**

**DESCRIPTION OF PROPERTY TO BE SEARCHED**

The premises located at 3685 Keating Street, San Diego, CA is a multi-residence apartment building on the south side of Keating Street in San Diego, California. The front door to 3685 Keating Street is colored brown and is located at the eastern most end of the apartment building and faces north. The numerals "3685" are visible in white on the front door to the residence.

The search shall include all rooms, attics, crawl spaces, safes, briefcases, storage areas, containers, garages, sheds, carports, storage facilities and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, trash cans and vehicles located on or near the premises, that are owned or under the control of the occupants of such premises, evidenced by prior surveillance, possession of keys, maintenance paper work, title, insurance papers, or registration for such vehicles in the name of the occupants including: (1) a black 2005 Honda Accord bearing California License Plate Number 5SET469 that is registered to Ramond Andrew DIZON and Marianne L. PENTECOSTES, and (2) a white 1999 Toyota Camry bearing California license plate number 4DDR879 registered to Cyrus BATCHAN.



## ATTACHMENT B

### ITEMS TO BE SEIZED

1. Documents containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances, including buyer lists, seller lists, pay-owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

2. Money, assets, and evidence of assets derived from or used in the purchase of controlled substances and records thereof, including but not limited to United States currency, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashiers checks receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

3. ~~Weapons, firearms, firearms accessories, body armor, and ammunition and documents relating to the purchase and/or possession of such items.~~

4. Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephone, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, personal identification documents and documents relating to obtaining false identification including birth certificates, drivers license, immigration cards and other forms of identification which the same would use other names and identities other than his or her own.

5. All incoming telephone calls received at the residence during the execution of the search warrant and all calls received on cellular telephones found during the execution of the warrant.

6. Devices used to conduct counter-surveillance against law enforcement, such as radio scanners, police radios, surveillance cameras and monitors and recording devices and cameras.

7. Photographs and video and audio recordings which document an association with other coconspirators and/or which display narcotics, firearms, or money and proceeds from narcotics transactions.

8. Packages and contents that were delivered to the residence, or were about to be sent by the occupants.

9. Drug paraphernalia to include: distribution materials including scales, plastic baggies, electrical and duct tape, and other odor masking materials.

10. Police radio scanners, pagers, cellular telephones, facsimile machines, telephone answering machines, Caller ID system, and prepaid telephone cards.

11. Travel documents including itineraries, airline tickets, boarding passes, motel and hotel receipts, rental car receipts, passports and visas, credit card receipts, shipping and receiving documents relating to the delivery of packages.

12. Banking and financial institution records, bank statements, credit card statements, canceled checks, money orders, deposit slips, orders for or receipt of money transfer by wire, checking and saving books, financial institution statements, safe deposit boxes, loan statements, tax returns, business and personal ledgers, and accounting records.

13. Records relating to the lease of storage lockers, telephone/address directories and other papers containing telephone numbers and addresses.

14. Records related to the purchase of real estate, vehicles, precious metals, jewelry and other tangible assets.

15. Automotive parts and devices used to create clandestine compartments to hide large quantities of drugs and/or currency.

16. Digital storage devices including: floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magnet optical cartridges, personal digital assistance, pagers, money chips, thumb drives, jump drives, flash drives, portable hard drives and computers containing hard drives. All electronic devices, such as computers, which include the central processing units, internal and external devices, internal and external storage equipment or media, terminals or video display units, together with peripheral equipment, such as keyboards, printers, modems, and programmable telephone dialing devices, and operating system software, program software, applications software, manuals for the software and hardware, electronic organizers, or personal digital assistants and computer discs and CD's, cellular telephones and SIM cards. All seized computers shall be returned to the defendants or the defendant's agent within 10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the Government will seek from the Court an extension of time within which to return the applicable devices and/or equipment.

17. With respect to any and all electronically stored information in cellular phones and PDAs, agents may access, record, and seize the following:

   a.    telephone numbers of incoming/outgoing calls stored in the call registry;

   b.    Digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

   c.    Any incoming/outgoing text messages relating to controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, and money laundering offenses under 18 U.S.C. § 1956;

   d.    telephone subscriber information;

   e.    the telephone numbers stored in the cellular telephone and/or PDA; and

   f.    any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular phone including but not limited to photographs, videos, e-mail, and voice mail relating to controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, and money laundering offenses under 18 U.S.C. § 1956.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

**UNITED STATES OF AMERICA**                          )
                                                      )   SS
**SOUTHERN DISTRICT OF CALIFORNIA**                   )

I, Brett O'Connor, being duly sworn, hereby depose and say:

1.    I make this affidavit in support of an application for a search warrant in furtherance of an investigation conducted by special agents of the United States Drug Enforcement Administration ("DEA") for the premises located at 3685 Keating Street, San Diego, California (hereafter "the target location") described further in Attachment A.

2.    One of the occupants of the target location is Ramond Andrew DIZON ("DIZON") who was recently indicted in two related cases on February 22, 2008.   In Criminal Case No. 08CR0508-BEN, DIZON is charged with conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1), as well as possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). In Criminal Case No. 08CR0511-BEN, DIZON is charged with six others with conspiracy to distribute oxycodone[1] and hydrocodone bitartrate[2] in violation 21 U.S.C. §§ 846 and 841(a)(1), and distribution of hydrocodone bitartrate in violation 21 U.S.C. § 841(a)(1).

3.    The purpose of the search warrant is to seize (1) property that constitutes evidence of the commission of controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and money laundering offenses under 18 U.S.C. § 1956, (2) contraband, fruits of crime or things otherwise criminally possessed, and (3) property designed or intended for use or which is or has been used as a means of committing a criminal offense.

---

[1]    Oxycodone is a potent and potentially addictive opioid analgesic medication synthesized from thebaine.  It is a Schedule II controlled substance both as a single agent and in combination with other products such as acetaminophen, ibuprofen, or asprin.

[2]    Hydrocodone is a narcotic which relieves pain by binding to opioid receptors in the brain and spinal cord.  Pure hydrocodone, and forms containing more than 15 mg per dosage unit, are Schedule II controlled substances.  Controlled purchases and seizures conducted over the course of this investigation to date have involved  commercially prepared tablets of hydrocodone bitartrate with acetaminophen, consisting of less than 15 mg hydrocodone per dosage unit and constitute Schedule III controlled substances.  All references found herein to "hydrocodone" refer to tablets consisting of hydrocodone bitartrate with acetaminophen.

1    4.    The information contained in this affidavit is based on my personal experience and

2  training, consultation with other special agents of DEA, the Federal Bureau of Investigation ("FBI"),

3  the Criminal Investigation Division of the Internal Revenue Service ("IRS"), officers of the San Diego

4  Police Department ("SDPD") and other law enforcement officers.  The evidence and information

5  contained herein was developed from a review of intercepted wire and electronic communications

6  pursuant to prior district court authorization, interviews with sources of information, financial

7  documents secured by grand jury subpoena, surveillance records, vehicle records from the California

8  Department of Motor Vehicles ("DMV"), and public records.  Agents' interpretation of code words and

9  phrases are described further in brackets ("[ ]").

10                            **EXPERIENCE AND TRAINING**

11    5.    I have been employed as a Special Agent with the DEA since July of 2004.  I am

12  currently assigned to Enforcement Group Three within the San Diego Field Division.  I have received

13  extensive training in the field of narcotics enforcement.  I have attended the DEA Academy at Quantico,

14  Virginia for 16 weeks and have participated in narcotics investigations from street-level distributors to

15  large-scale traffickers. I have interviewed and operated informants, executed search warrants, purchased

16  drugs in an undercover capacity, arrested and interviewed subjects, conducted physical surveillance,

17  utilized electronic and video surveillance, and testified in federal court.  I have become familiar with

18  the techniques and methods utilized by drug traffickers.  In addition to the above-stated formal training,

19  I have also worked with and consulted numerous agents and law enforcement officers who have

20  investigated drug distribution and trafficking throughout the United States, including Southern

21  California.

22    6.    In the course of my law enforcement experience, I have participated in investigations of

23  crimes involving the importation and distribution of controlled substances and money laundering.  I

24  have arrested and participated in the arrests of numerous individuals for various controlled substance

25  violations.  I have participated in the execution of search warrants relating to illegal drug offenses.  I

26  have received training in the methods used by drug traffickers to import and distribute controlled

27  substances and launder drug proceeds to promote the drug trafficking activity and conceal or disguise

28

2

1  the nature, source, and ownership of the drug proceeds. I have conducted and participated in numerous

2  investigations involving surveillance of individuals associated with drug trafficking. I have conducted

3  and participated in numerous interviews of individuals involved with drug trafficking.

4        7.     Based upon my experience and training, consultation with other law enforcement officers

5  experienced in controlled substances and financial investigations, and all the facts and opinions set forth

6  in this affidavit, I know that:

7        a.     Individuals involved in drug trafficking often maintain at their residence records

8  and ledgers evidencing their trafficking activities in order to keep track of the ordering, purchasing,

9  storage, distribution and transportation of controlled substances. At times, the drugs may be sold, but

10  documentary records and ledgers often remain for long periods of time to memorialize past transactions,

11  the status of accounts receivable and accounts payable, and the names and telephone numbers of

12  suppliers, customers and coconspirators.

13        b.     Individuals involved in drug dealing must often rely on others to obtain the

14  controlled substances and to help them market the drugs and evidence of the identities of these criminal

15  associates is often maintained at their residence and/or place of business.

16        c.     Individuals involved in drug dealing utilize cellular telephones and personal digital

17  assistants ("PDAs") to maintain contact with co-conspirators and to conduct their criminal activity. Drug

18  traffickers use cellular phones and PDAs, in part, because of their belief in the inability of law

19  enforcement personnel to simultaneously track the originating and destination phone numbers of calls

20  placed to and from their cellular phones and PDAs. Cellular telephones and PDAs contain wire and

21  electronic data concerning telephonic contact, text messages, and electronic mail messages with co-

22  conspirators, as well as telephone books containing contact information for co-conspirators. Members

23  of drug trafficking and distribution organizations also utilize cell phones and PDAs with photograph and

24  video capabilities to take photographs and videos of other members of drug trafficking and distribution

25  organizations, drugs, money, and assets purchased with drug proceeds.

26

27

28

3

1          d.    Based on prior searches of premises used by individuals involved in drug

2   trafficking, I believe I will find articles of personal property evidencing the identity of persons

3   occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

4          e.    Individuals involved in drug trafficking will often conceal contraband and

5   evidence of their drug dealing in vehicles outside their residence in order to prevent detection and

6   seizure by officers conducting search warrants at the residence.

7          f.    Individuals involved in drug trafficking earn sums of money and often maintain

8   large amounts of United States Currency at their residence and often hide United States Currency in

9   safes, false compartments, and other locations inside their home.  Individuals involved in drug

10  trafficking also try to conceal and disguise the nature, source, and ownership of drug proceeds in a

11  variety of ways including: (1) placing assets in names other than their own to avoid detection while

12  maintaining control; (2) laundering the money through what appears to be a legitimate business or

13  businesses; and (3) using the money to buy assets which are hard to trace.  Substantial sums of United

14  States Currency and records of financial transactions are often found at the residence maintained by drug

15  traffickers.

16         g.    Individuals involved in drug trafficking often send and receive packages

17  that contain contraband, money orders, and United States Currency.  Packages that contain contraband,

18  money orders, and United States Currency are often found at residences maintained by drug traffickers.

19         h.    Individuals involved in drug trafficking will often maintain weapons, firearms

20  and ammunition on their person or at their residence and cars in order to protect themselves and guard

21  their drugs and drug profits, and for enforcement purposes during their drug dealings.  These weapons

22  and firearms are used and can be used as an instrumentality of the drug trafficking and money

23  laundering crimes.

24         i.    Individuals involved in drug trafficking often take photographs of themselves,

25  their associates, their property, and their controlled substances.  Drug traffickers often maintain these

26  photographs at their residences or in their vehicles.  Therefore, I am requesting permission to search the

27

28

                                                    4

1  residences listed within this warrant and it's attachment(s) for and to seize photographs that law
2  enforcement agents determine to be of evidentiary value.

3      j.    Individuals engaging in drug transportation often use computers to
4  communicate with co-conspirators by means of electronic mail ("e-mail") and for the storage of records.
5  Moreover, I know that digital evidence can be stored on a variety of systems and storage devices
6  including: hard disk drives, floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magneto optical
7  cartridges, personal digital assistance, pagers, money chips, thumb drives, flash drives, and portable hard
8  drives. Therefore, I am requesting permission to seize computers, including printers, monitors,
9  keyboards, scanners, and all forms of media storage that may be found at the residence.

10      8.    It is also my opinion and belief that the above-described documents are permanently
11  possessed by drug traffickers much the same way a legitimate business will maintain records and tools
12  of its trade whether or not the business has a particular item in inventory on a given date. These
13  documents are kept by drug traffickers whether or not the trafficker is in possession of any drugs at any
14  given moment. I believe that the seizure of such documents will provide evidence of the events set forth
15  in this affidavit and that such documents can be found in the residence despite any lapse of the time
16  between the events described and the anticipated search pursuant to this warrant.

17      9.    The investigation into the criminal activities of DIZON and others reveals that the
18  pharmaceutical and cocaine distribution and money laundering activities have been extensive for at least
19  one year. Furthermore, due to the large quantities of controlled substances distributed, the assets
20  acquired by the target subjects, and the relatively sophisticated and circuitous manner in which the drug
21  proceeds have been laundered, I believe DIZON and others have been engaged in drug trafficking and
22  money laundering for a long period of time. Consequently, I believe that there will be historical records
23  of drug trafficking and money laundering at the target location.

24      **OVERVIEW OF THE TARGET SUBJECTS**

25      10.    The following is a brief description of Ramond Andrew DIZON, Cyrus BATCHAN, and
26  Karl DeLeon MURRAH, the target subjects whose drug trafficking and money laundering activities
27  provide probable cause for the search warrant on the target location.

28

5

1      a. **Ramond Andrew DIZON** is a 29-year old man who resides at the target location

2  with his roommate, Cyrus BATCHAN. DIZON is a graduate of the USD School of Law, but is not yet

3  a member of the California bar. DIZON is currently on probation following his 2006 conviction for

4  possession of cocaine for sale. DIZON is charged in Criminal Case No. 08CR0508-BEN with

5  conspiring with MURRAH to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1), as well

6  as possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). DIZON is charged

7  with MURRAH and five others in Criminal Case No. 08CR0511-BEN with conspiracy to distribute

8  hydrocodone bitartrate and oxycodone, as well as distribution of hydrocodone bitartrate in violation 21

9  U.S.C. § 841(a)(1). Based on intercepted calls, surveillance, review of financial records, and a search

10  warrant executed on a FedEx package, agents believe that DIZON may have laundered drug proceeds

11  by having customers send proceeds from the sale of pharmaceuticals in the form of blank money orders

12  and then directing others to cash those money orders on behalf of DIZON.

13      b. **Cyrus BATCHAN** is the 30-year old associate and current roommate of

14  DIZON's at the target location. Based on surveillance and wire interceptions, agents are aware that

15  BATCHAN has aided DIZON in his drug trafficking and money laundering by allowing customers to

16  deposit money into BATCHAN's bank account on behalf of DIZON, by picking up packages of money

17  orders on behalf of DIZON, and by cashing money orders on behalf of DIZON. A source of

18  information, whose information was substantially corroborated and was determined to be reliable,

19  informed agents that BATCHAN is an avid gun collector.

20      c. **Karl DeLeon MURRAH** is a 28-year old man who conspired with DIZON to

21  distribute pharmaceuticals and cocaine. MURRAH is charged in Criminal Case No. 08CR0510-BEN

22  with distribution of MDMA (Ecstasy) in violation of 21 U.S.C. § 841(a)(1). MURRAH is charged in

23  Criminal Case No. 08CR0508-BEN, is charged with conspiracy to distribute cocaine in violation of 21

24  U.S.C. §§ 846 and 841(a)(1), and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1).

25  MURRAH is charged with six others in Criminal Case No. 08CR0511-BEN with conspiracy to

26  distribute oxycodone and hydrocodone in violation of 21 U.S.C. §§ 846 and 841(a)(1), and distribution

27  of hydrocodone bitartrate in violation 21 U.S.C. § 841(a)(1).

28

## FACTS ESTABLISHING PROBABLE CAUSE

### Shipment of hydrocodone tablets seized on May 4, 2006

11.     On May 4, 2006, a FedEx parcel destined for Boston, Massachusetts was inspected by FedEx personnel and was found to contain approximately 7,000 hydrocodone tablets. A review of the FedEx security camera photographs revealed that DIZON was the individual who shipped the parcel containing the pharmaceuticals.

### State search warrant executed on the target location on May 11, 2006

12.     On May 11, 2006, agents served a state of California search warrant at the target location at 3685 Keating Street in San Diego. During the search, agents seized, among other things, packages of suspected cocaine, two plastic containers containing user amounts of marijuana, various pharmaceuticals, a metal pill crusher, a digital scale, miscellaneous drug paraphernalia, $5,120 in United States Currency, mailing envelopes, shipping labels, and nine blank (no designated payee) money orders totaling $8,500. Agents later determined that the money orders had been purchased in the Boston, Massachusetts area.

### Pharmaceutical transaction on July 16, 2007

13.     On July 16, 2007, at approximately 8:36 p.m., monitors intercepted a call between MURRAH and DIZON regarding a pharmaceutical transaction. During the call, MURRAH confirmed that DIZON wanted "5 and 2." [Agents believe that, in this call, MURRAH confirmed that DIZON wanted 5,000 tablets of hydrocodone and two bottles of OxyContin.].

14.     On July 16, 2007, at approximately 8:39 p.m., agents observed MURRAH, arrive at the target location (DIZON's apartment located at 3685 Keating). Agents observed MURRAH carry a white shopping bag from the trunk of his BMW to the target location. At approximately 9:40 p.m., agents observed DIZON leave his apartment and drive away in his blue Honda Accord.

### Shipments of money orders in July 2007 and August 2007

15.     On July 24, 2007 and July 26, 2007, monitors intercepted calls indicating that DIZON had directed a parcel be sent to MURRAH's business, Swiftstar Design and Screenprinting. During the calls, it was determined that DIZON and BATCHAN planned to pick up the parcel at the FedEx location in San Diego because MURRAH was not at his business when FedEx attempted to deliver the parcel.

7

1   Agents set up surveillance at the FedEx location and observed BATCHAN leave the FedEx location

2   with a parcel. Agents later observed DIZON and BATCHAN at the Universal Smoke Shop and Check

3   Cashing store where DIZON was overheard cashing a money order and negotiating with the store clerk

4   regarding future money order transactions.

5        16.    On August 21, 2007, monitors intercepted a call between MURRAH and DIZON

6   regarding a shipment of money orders. The call indicated that DIZON had arranged for FedEx parcels

7   to arrive at MURRAH's business, Swiftstar Design and Screenprinting. During the call, MURRAH

8   said, "…you have that thing at my shop. I don't know if that's empty or if there's something in it."

9   DIZON replied, "Yeah, it's empty and there's gonna be an envelope that comes tomorrow."

10       17.    On August 23, 2007, a FedEx office in San Diego received a FedEx envelope that was

11  sent from Mike Cilfford at 437 D Street, Boston, Massachusetts to Swiftstar Design and Screenprinting,

12  8680 Miralani Drive, San Diego, California.

13       18.    On August 23, 2007, agents served a federal search warrant on FedEx to open the

14  FedEx parcel sent from Mike Cilfford in Boston to Swiftstar Design and Screenprinting. Agents opened

15  the white FedEx envelope and removed a white letter sized envelope that contained 15 money orders

16  totaling $7,500. Agents made photocopies of the money orders and air bill. Agents then placed the

17  original money orders into a new white FedEx envelope similar to the envelope searched. The original

18  air bill was placed with the new envelope containing the money orders and the envelope was then sealed

19  and custody of the envelope was returned to a FedEx official. At approximately 6:57 p.m., DIZON

20  arrived at the FedEx office in San Diego. At approximately 7:02 p.m., DIZON was observed leaving

21  the FedEx location carrying a white FedEx envelope.

22  **Cocaine transaction On September 29, 2007**

23       19.    On September 29, 2007, at approximately 7:06 p.m., monitors intercepted a call

24  between MURRAH and DIZON regarding a cocaine transaction. During the call, MURRAH used

25  coded language to tell DIZON that he purchased one kilogram of cocaine for $14,000. During the call,

26  MURRAH stated, "I'm looking at that baseball cap [kilogram of cocaine] from yesterday?" "They

27  imported that cap [kilogram of cocaine] really nice." "I'm looking at it right now." DIZON replied,

28  "All right. Grab it." MURRAH said, "Fuckin' really nice and shit. That's how they all come. You

1  know, 14 bucks [$14,000] a hat [kilogram of cocaine] though." DIZON replied, "It's a good deal."

2  MURRAH said, "I know, but then, you know, fuck I guess if you order more hats [kilograms of

3  cocaine], you know, for the game, we can definitely get a better price for the team, you know what I

4  mean?" DIZON replied, "Yeah." MURRAH said, "We just want to get that sample hat [kilogram of

5  cocaine]." DIZON replied, "Grab it." Later in the call DIZON said, "Do you want me to come to you

6  or what?" MURRAH replied, "Hey, settle down Haus. Hold on. You want to do one [kilogram of

7  cocaine] tonight or what?" DIZON replied, "Yeah." MURRAH asked, "Are you ready to go or what?"

8  DIZON replied, "Sure."

9         20.    Agents established surveillance at the target location to monitor the suspected cocaine

10  transaction during the evening of September 29, 2007. Through surveillance and wire interceptions,

11  agents determined that DIZON and MURRAH went to Wal-Mart to buy plastic bags. DIZON and

12  MURRAH then returned to MURRAH's Chula Vista residence. Agents observed the blinds close in a

13  room on the second floor, which was the only room with lights on. At approximately 12:58 a.m., agents

14  observed DIZON leave MURRAH's residence carrying a large white plastic bag and get into his vehicle.

15  At approximately 1:30 a.m., a SDPD unit conducted a traffic stop on DIZON's vehicle for speeding and

16  illegal window tint. During the traffic stop, SDPD Officers conducted a search of the trunk of DIZON's

17  vehicle and discovered 36 plastic bags each containing approximately 30 grams of cocaine. Officers

18  also found a sales receipt in the center console that reflected the purchase of plastic bags from Wal Mart.

19  Officers arrested DIZON and transferred him to San Diego County Central Jail.

20         21.    On October 1, 2007, monitors intercepted a call between BATCHAN and MURRAH

21  regarding DIZON's arrest. During the call, BATCHAN told MURRAH that BATCHAN believed that

22  "somebody" [Police Officers] had been in BATCHAN's house [the target location]. BATCHAN said

23  "all this fool's [DIZON's] supplement bottles" are on the counter in the living room and that there is

24  a FedEx box on top of the trash cans. MURRAH asked how they [Police Officers] would have gotten

25  in. BATCHAN suggested that they "picked him [DIZON] up here." BATCHAN then asked MURRAH

26  if he should get rid of "all the shit," referring to the supplement bottles. MURRAH told BATCHAN

27  not to get rid of the supplement bottles. [Based upon intercepted calls and FedEx records, agents

28  believe one method DIZON used to distribute pharmaceuticals was to fill empty supplement bottles with

1  pharmaceuticals and ship them via FedEx to his customers. In return, DIZON's customers would ship

2  the empty supplement bottles, known on the wire intercepts as "empties", back to DIZON. Agents

3  believe that the supplement bottles referred to by BATCHAN and MURRAH during the call on October

4  1, 2007, had been used to ship hydrocodone and/or oxycodone.]

5  **Financial Analysis of DIZON and BATCHAN**

6        22.    Agents subpoenaed California State Tax Records from the California Employment

7  Development Department ("EDD") and bank records in order to compare DIZON's known legal source

8  income with DIZON's annual bank deposits.

9        23.    During 2005, DIZON received a total of $10,296.53 reported wages. Bank records for

10  2005 show deposits of more than $178,000 into DIZON's two primary checking accounts at Wells

11  Fargo Bank (account no. 538-2117546) and Washington Mutual Bank (account no. 092-1048831-1).

12        24.    During 2006, DIZON received a total of $13,984.62 reported wages. Bank records for

13  calendar year 2006 show deposits of almost $230,000 into DIZON's bank accounts at Wells Fargo Bank

14  and Washington Mutual Bank.

15        25.    During 2007, DIZON received a total of $19,987.76 reported wages. Bank records for

16  the first nine months of calendar year 2007 show deposits of almost $76,000 into three accounts in

17  DIZON's name, including the Washington Mutual account described above, as well as two new Wells

18  Fargo accounts.

19        26.    Agents believe that BATCHAN participated with DIZON and others in a conspiracy

20  to launder DIZON's drug proceeds. Agents have identified a bank account associated with BATCHAN:

21  Bank of America account 00501-42526 in the name of Cyrus BATCHAN dba Blue Flame. According

22  to Bank of America records for this account, on January 9, 2006, $7,500 in cash was deposited into

23  BATCHAN's account in Yonkers, New York (Getty Square Branch) . The following day, on January

24  10, 2006, there were two more $7,500 deposits into BATCHAN's account: the first deposit on was done

25  at the Getty Square branch and the second deposit was done at the Peabody branch. The three deposits

26  into BATCHAN's accounts on January 9th and January 10th totaled $22,500.00 . BATCHAN then

27  wrote four checks totaling $19,000 from this account to DIZON.

28

27.    During March of 2006 there were additional cash deposits into BATCHAN's Bank of America account from Massachusetts. On March 10, 2006, $9,000 cash was deposited into the account in Boston, Massachusetts (Broadway branch). On March 13, 2006, $5,000 cash was deposited into BATCHAN's account in Massachusetts at the Exeter Plaza branch. On March 14, 2006, $5,000 cash was deposited in Massachusetts at the Exeter Plaza branch. These deposits totaled $19,000. BATCHAN then wrote three checks to DIZON in an apparent attempt to disguise and conceal the nature, source, and ownership of the funds. Check 1039 dated March 11, 2006, was written to DIZON for the amount of $5,500.00. Check number 1040 dated March 15, 2006, was written to DIZON for the amount of $9,000.00. Check number 1041 dated March 21, 2006, was written to DIZON for the amount of $5,000.00. These three checks totaled $19,500.00.

**DIZON's Connection to Target Location**

28.    California DMV records indicates that the target location is DIZON's address. On October 31, 2007, agents obtained utility records from San Diego Gas and Electric (SDG&E) pertaining to the target location. The utility records indicate that DIZON maintains the SDG&E account for the target location. AT&T Wireless records also indicate that DIZON is the subscriber to a cellular telephone, with the billing address as the target location. DIZON, or vehicles known to be utilized by DIZON, have been observed on numerous occasions at the target location as recently as January of 2008. BATCHAN or vehicles known to be utilized by BATCHAN, have been observed on numerous occasions at the target location as recently as January of 2008.

29.    DIZON and his girlfriend Marianne L. PENTECOSTES are listed as the registered owners of a black 2005 Honda Accord bearing California license plate number 5SET469. BATCHAN owns a white 1999 Toyota Camry bearing California license plate number 4DR879.

## SEARCH PROTOCOL FOR COMPUTERS

30.    This section describes the procedures that will be employed during this search to minimize the intrusion represented by the search of any electronic data found at the target location.

31.    Searching agents will be asked to use an incremental approach in searching for relevant electronic material. If the agents are able to examine relevant portions of computer drives to identify responsive material within a reasonable time period on-site, then the agents will attempt to create

1  forensic images of computers or laptops seized. However, if the agents cannot perform the search

2  within a reasonable period on-site, will they employ alternate procedures to complete the review off-site.

3  In that case, the computer expert will create forensic images of electronic data sources as necessary to

4  complete the search off-site.

5      32.    A forensic image is an exact physical copy of a computer hard drive or other similar

6  electronic storage media. A forensic image thus captures all of the data on the hard drive (or other

7  media) without the data being viewed and without changing the data in any way. There are many

8  reasons why it is not feasible to conduct a forensic analysis of data on-site. First, analysis of the data

9  following the creation of the forensic image is a highly technical process that requires specific expertise,

10  equipment and software. Second, there are literally thousands of different hardware items and software

11  programs that can be commercially purchased, installed and custom-configured on a user's computer

12  system. Third, it is only after a thorough examination and analysis, that a trained computer forensic

13  examiner can determine whether he needs to obtain specialized hardware or software (not to mention

14  specialized training on the specialized software) in order to view and analyze the data contained in

15  electronic form.

16      33.    The analysis of data on a computer may also be an extremely tedious and time

17  consuming process. In addition, to requiring special technical skills, equipment and software, it may

18  take days to properly search a single hard drive for specific data. With current technology, each search

19  "hit" must be reviewed in its context by an agent to determine whether the data is within the scope of

20  the warrant. In other words, merely finding a good "hit" does not end the review process.

21      34.    Analyzing data on-site has become increasingly impossible as the volume of data stored

22  on a typical computer system has increased. For example, a single gigabyte of storage space (i.e., 1,000

23  megabytes) is the equivalent of 500,000 double-spaced pages of text. Computer hard drives capable of

24  storing 100s of gigabytes of data are becoming quite common in newer desktop computers.

25      35.    In addition to the sheer volume, the data may be stored in a variety of formats or

26  encrypted. The volume of data of course extends the time that it takes to analyze the image in a

27  laboratory. Running keyword searches takes longer and results in more hits that must be individually

28  examined for relevance. Moreover, certain file formats do not lend themselves to keyword searches

12

1 (e.g., many common electronic mail, database and spreadsheet applications do not store data as

2 searchable text).

3     36.     Based on the foregoing, searching any computer or forensic image for the information

4 subject to seizure pursuant to this warrant may require a range of data analysis techniques and may

5 require off-site analysis.

6     37.     Nevertheless, all forensic analysis of the imaged data will be directed exclusively to

7 the identification and seizure of information within the scope of this warrant. In the course of proper

8 examination, the forensic examiner may view information that is potentially privileged or not within the

9 scope of the warrant. If so, this information will not be made available to the investigating agents unless

10 it appears to the examiner that the information relates to the commission of offenses not covered by this

11 warrant. In that event, the examiner will confer with the investigator and/or the prosecuting attorney

12 so that they can determine whether to seek a further search warrant for the newly uncovered data.

13     38.     All seized computers shall be returned to the defendants or the defendant's agent within

14 10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the

15 Government will seek from the Court an extension of time within which to return the applicable devices

16 and/or equipment.

17     **SEARCH PROTOCOL FOR CELLULAR TELEPHONES AND PDAS**

18     39.     With respect to any and all electronically stored information in cellular phones or

19 PDAs at the target locations, agents respectfully request that this Court authorize the agents to access,

20 record, and seize the following:

21         a.     telephone numbers of incoming/outgoing calls stored in the call registry;

22         b.     Digital, cellular, and/or telephone numbers and/or direct connect numbers,

23 names and identities stored in the directories;

24         c.     Any incoming/outgoing text messages regarding violations of 21 U.S.C. §§

25 841(a)(1), 843(b), 846, or 18 U.S.C. § 1956;

26         d.     telephone subscriber information;

27         e.     the stored telephone numbers dialed from the cell phone and/or PDA; and

28         f.     any other electronic information in the stored memory and/or accessed by the

1   active electronic features of the digital or cellular phone including but not limited to photographs,

2   videos, e-mail, and voice mail regarding violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, or 18 U.S.C.

3   § 1956.

4       40.    If the agents cannot analyze the cellular telephone or PDA on site, they may send the

5   cellular telephone or DPA to the Regional Crime Forensic Lab (RCFL) or the DEA Digital Lab to all

6   analysts or forensic examiners to examine, analyze, and make a record of the contents of the information

7   stored in the seized cellular telephone or PDA.

8                   **CONCLUSION AND SEALING REQUEST**

9       41.    Based on my training and experience, consultation with other special agents and law

10  enforcement officers, and all of the facts and opinions set forth in this affidavit, there is probable cause

11  to believe that federal crimes have been committed, including controlled substances violations under

12  21 U.S.C. §§ 841(a)(1), 843(b), and 846, and money laundering violations under 18 U.S.C. § 1956.

13  There is also probable cause to believe that property constituting evidence of the offenses, contraband,

14  fruits of crime or things otherwise criminally possessed, and property designed or intended for use or

15  which is or has been used as a means of committing the criminal offenses will be found in the target

16  location described further in Attachment A.

17      42.    Because this is an ongoing investigation and premature disclosure of the investigation

18  could endanger agents and officers, cause the target subjects and others to flee and cause destruction of

19  evidence, I request that this affidavit, the application for the search warrant, the search warrant, and all

20  other associated court records be sealed until further court ordered.

21          I declare under penalty of perjury that the foregoing is true and correct.

22

23                              BRETT O'CONNOR
                                Special Agent
                                Drug Enforcement Administration

24

25  Sworn to and subscribed before me
    this _____ day of March, 2008.

26

27  HONORABLE CATHY ANN BENCIVENGO
    United States Magistrate Judge

28

                                14